[Filed May 3, 1889.]

JOHN SISEMORE, APPELLANT, v. HORACE PELTON, RESPONDENT.

IN A SUIT TO ESTABLISH BY PAROL EVIDENCE A RESULTING TRUST IN REAL PROPERTY, upon the alleged grounds that it was purchased and the conveyance of the legal title taken in the name of one person, while the purchase price was paid by another, the evidence of the payment of the purchase price, or of the exact portion of it which was paid, where payment of a part only is claimed, in order to be effective, must be clear, certain, and convincing. And it is indispensable to the establishment of such a trust that the payment should be actually made by the beneficiary, or that an absolute obligation to pay should be incurred by him, as a part of the original transaction of purchase, at or before the time of the conveyance.

IN ORDER TO ESTABLISH A CONSTRUCTIVE TRUST IN REAL PROPERTY, upon the grounds that the conveyance of the legal title was taken by one possessing some fiduciary character, or standing in some fiduciary relation, it must be shown by clear and unmistakable evidence that the purchase was made with trust funds.

WHERE S. AND P. WERE PARTNERS IN BUSINESS, and the latter purchased from I. a certain tract of land by taking an assignment from I. of a certificate of purchase thereof from the state, which I. had received upon his purchase of the land as school land; and upon which purchase he paid one installment and executed his three several promissory notes in payment of the other installments, which, by an understanding with P., had with him at the time of the assignment of the certificate of purchase, I. was to pay off, but neglected the payment of two of them, and S. subsequently, and long after the death of P., paid them, with the accrued interest thereon, and had the deed to the land executed by the state to P.: *held*, that the fact of such payment by S. did not give a resulting trust in his favor; *held further*, that as there was no evidence showing that P. in his purchase of the land from I. paid for it with partnership funds, S. could not claim that a constructive trust arose, or was created in his favor.

*H. K. Hanna*, for Appellant.

*C. W. Kahler*, for Respondent.

APPEAL from a decree of the circuit court for the county of Jackson, dismissing the appellant's complaint. The appellant commenced a suit against the respondent in said circuit court, to have a resulting trust declared in his favor in a certain parcel of land, consisting of 160 acres, situated in what is known as Sam's Valley, Jackson County, Oregon, and designated as the Hyde ranch. The land is the northeast quarter of section 36, township 35 south, range 3 west, and was formerly school land belonging to the state of Oregon. It appears that one Mat R. Ish bought the land at a public sale of school lands in Jackson County, made by M. A. Williams, superintendent of common schools for that county, in pursuance of an order of the board of county commissioners thereof, and received the following certificate of purchase: —

"January 31, 1863.

"Jackson County,　　⎰
　　State of Oregon.⎱

"This is to certify that at a public sale of school lands, under the order of the board of county commissioners, I

this day sold to Mat R. Ish the following described tract of land, to wit, the northeast quarter of section No. 36, in township No. 35 south, of range No. 3 west, Willamette meridian, containing 160 acres.

"M. A. Williams, Sup't Com. Schools."

It does not appear clearly what the purchase price of the land was, nor what payments were made thereon at the time of the purchase. It appears, however, that Ish executed three promissory notes to the state of Oregon for eighty dollars each, to be paid in one, two, and three years from the date of the purchase, with interest thereon at the rate of ten per cent per annum, and that in 1863, the year in which he purchased the premises, he paid of the purchase price eighty dollars. Hence it may be inferred that the price of the land was two dollars an acre, aggregating $320, and that it was to be paid for, one fourth cash at the time of the sale, and the balance in the notes mentioned. On the back of the said certificate is the following indorsement:—

"For value received, I hereby assign and transfer all my right, title, and interest of and in the within certificate of sale to E. C. Pelton, or assigns, and authorize the deed for the land mentioned therein to be made to the said E. C. Pelton or his assigns.

"Witness my hand this twenty-second day of October, A. D. 1864.                    "Mat R. Ish.

"Witness: William Hoffman."

It further appears, by a certificate given by John Neuber, as treasurer of Jackson County, bearing date November 10, 1871, that said Ish, in 1864, paid to said county treasurer the sum of eighty-eight dollars on school land purchased by him from the superintendent of common schools. The appellant claimed in his testimony given in the case that, in the summer or fall of 1863, he entered

into a partnership with said E. C. Pelton, who then resided in said Jackson County; that the business of the partnership at that time was to be the buying and selling of hogs and other personal property; that appellant was unmarried at the time, but Pelton had a wife and a family, and the former resided and made his home with the latter upon a farm occupied by him, known as the Sam Smith ranch, the title of which was in Mary S. Pelton, then the wife of said E. C. Pelton, and one of the respondents herein; that late in the year 1863, or early in 1864, the said partners agreed to extend their business, and buy up and own land in said Sam's Valley; that in October, 1864, on appellant's return from Yreka, California, where he had been with a drove of hogs, he was informed by Pelton that the latter had purchased the said Hyde ranch for the partnership. The appellant's account of the affair is as follows: "In 1864, after we had this talk [referring to their conversation in regard to forming the partnership], he mentioned about buying the Hyde ranch, as we called it at that time, and we agreed for him to buy it if we could. After that, a while after I came back from California, again he told me he had bought this piece of land. That is the first piece we had bought since we had been partners. I don't know who he bought it of,—only what he told me. He told me he bought it of Mat Ish. I asked him at the time if long-nosed Bill Hyde was not in with Ish in this ranch. I think, as well as I recollect, he kind of laughed and said he had it all right. He did not show me any deed of conveyance for this land, and all I know about the purchase of it by Pelton was what he told me after I returned from California." It further appears that in February, 1865, appellant bought for the partnership a ranch adjoining the Hyde ranch, known as the Miller ranch, and took the deed to it in the name of Sisemore and Pelton, and farmed both of these ranches,

until the death of Pelton, which occurred September, 1865; that Pelton, at his death, left said Mary S. Pelton his widow, and the other respondents, his minor children, aged respectively eight, six, and four years; that appellant continued to reside with the family until 1867, when he married the widow, Mary S. Pelton, who is now his wife; that he was appointed administrator of the said E. C. Pelton, and took charge of the family and all of the said ranches. In his testimony, in answer to the question, "If, after the death of Mr. Pelton, he, at any time, ascertained that the title to this Hyde place was still in the state of Oregon, he might state when it was that he first ascertained it, and all that he did toward obtaining a title from the state," the appellant made the following answer: "I think it was in 1870 I came here to town, as there was a boom in land at that time, and I got uneasy about my titles, and I spoke to Jim Fay, and asked him to go down to the clerk's office with me and look up the titles of my land for me. He told me he could find nothing of this Hyde ranch on record. We then went to Mr. Hoffman, and he could not find anything. I then left it in the hands of Fay to do something with it, I did not know what, to try to get a title for me. I went home and left it in the hands of Fay. The next time I came back to town Fay told me 'he had no trace of anything.' I then went down to Ish's ranch, and inquired of Jacob Ish where Mat was. He said he was down on the coast somewhere, but would be up here in a few days to run his header. Then when Mat came, he knew nothing. I says to Hoffman, 'Maybe you can find something in your private books, as Mr. Pelton always put a great deal of confidence in you.' He said 'he would go and see if he could.' He returned presently with two notes that Mat Ish had given to the state, that had never been paid. Mat Ish had given these notes in payment of the Hyde

ranch; that is the way they read to me. Fay took the notes and looked at them, and says 'they were outlawed; let us go and see if you can make a payment on them and renew them.' We went up to Max Muller, I made a payment on those notes, and he indorsed it on the notes. I then told him I would pay these notes off as soon as I could get the money. Fay had told me that was the only way I could get a title to it. Some time after that, I did not know how long it was, I got the money and came in and paid both notes. At the time I paid the notes I spoke to Fay, and told him I wanted half of the land that was mine. He advised me to pay the notes and take the deed out in Pelton's name, and they would hold the deed in equity, and it would show on record here, and I would have no trouble in getting my rights. Mr. Hoffman advised me to do the same. The deed was issued for this land by the state in the name of Mr. Pelton, to the best of my knowledge. I had the deed placed upon record. I don't recollect how much it was I paid on those two notes. I made the payment of these two notes with the intention of getting one half of the land. My understanding from Fay at the time was, that that was the proper way to do it." The appellant, in corroboration of his testimony above set out, produced as a witness one B. F. Miller, who testified as follows: "As near as I can remember, some time in the spring or summer of 1864, Mr. Pelton told me he had taken John Sisemore in as a partner in buying stock, grain, and anything to trade on. He stated as his reasons for doing so, 'because that he thought John was a better hand to buy them than he was.' He also said 'that John had some little money, and if John made any trade with me for stock it would be the same as if he had made it'; they frequently bought hogs of me,—sometimes one, and sometimes the other. Sisemore bought

quite a large quantity of grain from me at one time, and paid the money for it, and Mr. Pelton received the grain. I sold them in February, 1865, as near as I can remember, a quarter-section,— the northwest quarter of section 31, township 35, range 2 west. Sisemore negotiated the trade, and I believe it is the land belonging to Sisemore and Pelton that is spoken of and known as the Miller ranch. During the conversation, after I had sold them this place, they told me their intention was to buy the Sam's Creek Valley. I made the deed to Sisemore and Pelton. They paid me fifteen hundred dollars for the ranch. Pelton was not present when the sale of the land was made. I said in my cross-examination that I believed that Mr. Pelton had purchased this Hyde property before I had this conversation with him about the partnership. I did not know at the time I was being questioned the exact date or month that Mr. Pelton bought the property from Ish. If this property was not bought by Mr. Pelton until the last of October, 1864, he told me of this partnership arrangement before; but I was under the impression that he had bought it before."

The appellant also produced as a witness Mrs. Sisemore, who testified that the occupation of Mr. Pelton, her former husband, at the time of his death, was farming and trading in hogs and stock; that appellant was engaged in business with him at the time of his death; that she could not say exactly how long they had been associated together in business, but thought it was since 1864; that there was no company purse kept by Mr. Pelton and Mr. Sisemore for household purposes that she knew of, and she thought there was no company purse kept by them at all. The respondent produced evidence tending to show that Pelton purchased the Hyde ranch prior to the formation of the partnership between him and the appellant; that appellant never claimed to have any interest therein un-

til 1886, when in talking over the affairs of the family he claimed that he had paid eight hundred and sixty odd dollars to the state, and thought he ought to be entitled to half the place, as he had paid for it. It also appears in evidence that Mat R. Ish, on the seventeenth day of March, 1870, signed a promissory note, wherein he promised to pay to the heirs of E. C. Pelton, or bearer, $272 for balance due on transfer of school land, and that he delivered the note to the appellant; that he did so after being informed by appellant that he, appellant, had paid the balance on the land.

THAYER, C. J.—In order to maintain the appellant's claim to an equitable estate in the premises in controversy, the facts of the case must show that a trust arose by operation of law in favor of the appellant. He must be able to demonstrate that the various transactions occurring between him and the said E. C. Pelton, and what he did in effecting title to the premises after Pelton's death, as disclosed by the evidence, created in his favor either a resulting or constructive trust. In other words, it must appear that in the purchase of the Hyde ranch, as it is called, the appellant paid the consideration money or some distinct part thereof; or that a fiduciary relation existed between him and Pelton at the time the purchase was made, and that the premises were paid for with trust funds.

The two classes of trusts arising by operation of law— resulting and constructive trusts—are distinct from each other; and the appellant's case must come within one or the other of them, or else he has no cause of suit. Either class of the trusts referred to may be established by parol evidence, but it must be clear, certain, and convincing.

Mr. Pomeroy says, in regard to the proof of a resulting trust, that "it is settled by a complete unanimity of de-

cisions that such evidence must be clear, strong, unequivocal, unmistakable, and must establish the fact of payment by the alleged beneficiary beyond a doubt. Where the payment of a part only is claimed, the evidence must show in the same clear manner the exact portion of the whole price which was paid." (Pomeroy's Eq. Jur., sec. 1040.)

The same author also says: "In pursuance of the ancient equitable principle that the beneficial estate follows the consideration, and attaches to the party from whom the consideration comes, the doctrine is settled in England and in a great majority of the American states, that where property is purchased and the conveyance of the legal title is taken in the name of one person, A, while the purchase price is paid by another person, B, a trust at once results in favor of the party who pays the price, and the holder of the legal title becomes a trustee for him. In order that this effect may be produced, however, it is absolutely indispensable that the payment should be actually made by the beneficiary B, or that an absolute obligation to pay should be incurred by him *as a part of the original transaction of purchase,* at or before the time of conveyance; no subsequent and entirely independent conduct, intervention, or payment on his part would raise any resulting trust." (Pomeroy's Eq. Jur., sec. 1037.)

And said author, in speaking of constructive trusts arising from the acts of persons already possessing some fiduciary character or standing in some fiduciary relation, says: "The evidence that the purchase was made with trust funds must however be clear and unmistakable." (Pomeroy's Eq. Jur., sec. 1049.)

Tested by these rules, which are elementary, the appellant's counsel cannot reasonably claim that a resulting or constructive trust, in favor of the appellant, arose out of the facts proved in the case.

It is not pretended that it is shown by the evidence that the appellant paid any part of the consideration money upon the purchase of the premises by Pelton from Ish, nor that the purchase was made with trust funds, although the counsel intimated at the hearing that it might be so inferred. But such facts cannot be so established by inference. They must be proved; not necessarily beyond a doubt, as Mr. Pomeroy states it, but by clear and cogent testimony, tending directly to confirm them.

The appellant did prove that he paid two of the notes, and accrued interest thereon, which were given by Ish in favor of the state of Oregon, upon the purchase by the latter of the premises from the school superintendent; but that of itself would not raise a resulting trust; it was not a payment of a part of the consideration of purchase of the premises by Pelton from Ish; it was a mere advancement upon a debt owed by Ish, and which, as between himself and Pelton's representatives, Ish was evidently bound to pay. And if it had been a part payment of the purchase price of the premises, upon the purchase by Pelton from Ish, it would not have aided the appellant's claim, as it was not a payment made "as a part of the original transaction of purchase, at or before the time of conveyance." I mean by the conveyance, the assignment of the certificate of purchase of the premises by Ish to Pelton.

The appellant's counsel seemed inclined to claim at the hearing that the payment by the appellant of the two notes and interest to the state constituted in some way a purchase of the premises from the state, which gave rise to a trust in the appellant's favor; but that position, in view of the facts, is not tenable. Ish purchased the property from the agent of the state, and sold his right under the purchase to Pelton. What the terms of the sale from

Ish to Pelton were, however, do not appear, although it is evident that Ish understood that he was to pay off the notes given for the purchase-money of the premises.    He did pay one of them the same year he made the assignment to Pelton of his certificate of purchase, but neglected the payment of the other two, and they remained unpaid until the appellant discovered the fact, long after they had matured, and paid them, and caused the deed to be executed from the state to Pelton, although dead at the time.    Ish, it appears, about the same time executed to Pelton's heirs his promissory note, intended to cover the advancement made by the appellant.    That the transactions last referred to did not raise a resulting trust, is too apparent to require discussion.    The act was a very generous one on the part of the appellant, but he secured to himself no legal rights thereby beyond a claim for money paid, laid out, and expended, if any at all.

Under the view herein expressed, the decree appealed from must be affirmed.

An order will therefore be entered herein accordingly.