Argued September 16; No. 15178 reversed, with directions, October 15, 1947; No. 15180 reversed, October 15, 1947; No. 15179, affirmed, October 15, 1947; rehearing denied, November 18, 1947

## HUGHES *v.* HELZER (No. 15178)
## HELZER *v.* HUGHES ET AL. (No. 15180)
## HELZER *v.* HUGHES ET AL. (No. 15179)

185 P. (2d) 537

John D. Galey, of Sweet Home (Galey & Galey, of Sweet Home, and Phelps & Burdick, of Portland, on brief), for appellants.

Joseph H. Page and W. Y. Masters, both of Portland, for respondents.

Before Lusk, Acting Chief Justice, and Belt, Bailey, Hay and Winslow, Justices.

HAY, J.

This opinion is concerned with three separate causes, which, by virtue of stipulations between the

parties, were consolidated for hearing both in the lower court and in this court. The first is an action in forcible detainer by Mary B. Hughes against John Helzer, for the restitution of possession of an acre of land in Multnomah County, which land is referred to in the evidence, and will be referred to herein, as Tract A. The second is a suit in equity by John B. Helzer (the same person as John Helzer, supra) against Mary B. Hughes, his former wife, and Charles Hughes, her present husband, to establish and enforce, in favor of the said John, as beneficiary, an implied trust in respect of title to an undivided one-half interest in two tracts of land in Multnomah County, the legal title to which is in the defendant Mary. This suit involves the above-mentioned Tract A and a tract of 1.432 acres, referred to in the evidence and herein as Tract B. The third is a suit by Bernice L. Helzer, a daughter of John and Mary, against Mary and Charles, to establish and enforce, in favor of the said Bernice, as beneficiary, an implied trust in respect of title to an undivided one-half interest in one-half acre of land in Multnomah County, the legal title to which is in the defendant Mary. This tract is referred to in the evidence and herein as Tract C. (As Charles's part in the two last-mentioned causes is relatively minor, we shall refer to Mary as if she were the sole defendant.)

John and Mary intermarried June 10, 1913. As husband and wife, they lived together for nearly thirty years. Sometime prior to 1939 (the date not being fixed by the evidence), Mary brought suit for divorce against John in the Circuit Court for Multnomah County, but, notwithstanding the suit, they continued to live together and apparently effected a reconciliation. The suit was not dismissed, however, but was permitted to languish. On February 20, 1939, John

and Mary became vendees under an executory contract of sale, by which they agreed to purchase Tracts A, B and C of Mrs. Ivy G. Starr for the sum of $1,952, payable $25 down and the remainder by installments of $25 a month, with interest. On January 7, 1942, Mary undertook to revive her suit for divorce, by filing an amended complaint therein. On February 1, 1942, it is claimed by Mary that the Starr contract was surrendered, and that, in lieu thereof, new contracts were executed, one in favor of Mary alone as purchaser, covering Tracts A and B, and the other in favor of John alone as purchaser, covering Tract C. On April 30, 1942, the circuit court entered a decree dissolving the marriage contract between Mary and John. On June 24, 1942, John surrendered his contract to purchase Tract C, and a new contract was executed, ante-dated to February 1, 1942, in favor of Mary alone as purchaser. On May 31, 1945, Tract C was conveyed by warranty deed by Mrs. Starr and her husband, to Mary, and, on August 20, 1945, the same persons conveyed Tracts A and B to Mary.

Prior to the filing of the amended complaint in the divorce suit, John and Mary, with some of their children, had resided together in a dilapidated building upon Tract A, which the witnesses referred to as "the old shack". There is no building upon Tract B. During the progress of the divorce suit, John was compelled by court order to remove from the family dwelling. It appears that he was brought before the court upon contempt proceedings, and was confined in the county jail for eleven days before finally being released. Thereafter, he took up his residence in downtown Portland. (The tracts involved herein are located near the extreme northeast boundary of the city.) After John had secured the contract in his own name as purchaser of

Tract C, he commenced the erection thereon of a residence for himself. He contends, however, that no agreement was ever made whereby he surrendered his interest under the original contract of purchase covering Tracts A, B and C, except in so far as was necessary to permit him to become the sole purchaser of Tract C. Sometime after he began to build the house, he agreed with Mary that he would enlarge the contemplated size of it and would complete the erection of the building except for the finishing work. Up to this time he had paid nothing upon his contract to purchase Tract C and was several months in arrears. There is no question but that he surrendered his contract. He and Bernice claim that he "turned it over" in favor of Mary and Bernice, upon the oral understanding and agreement that they would defray all bills for material then due or thereafter incurred. This is the basis of Bernice's suit. Mary's version of the matter is that the property was to be taken over by herself and that she was to pay the bills.

When the construction of the new house had proceeded to a point where it was habitable, Mary and Bernice moved into it, and John made his home in the old shack upon Tract A. Mary and Bernice continued to reside in the new house until shortly after Mary married Charles Hughes. The work which John had agreed to perform upon the new residence was substantially completed. At about that time, bad feeling developed between John on the one hand and Mary and Charles on the other. During his occupancy of the shack, John had been paying Mary the sum of $25 per month. This sum, according to Mary's contention, was rent for the shack. John claims, however, that it was a sum agreed upon between Mary and himself as representing his proportion of the monthly installments

of the purchase price due upon Tracts A and B, (which installments, under the new contract, had been reduced to $15 a month), besides taxes and water and light bills. As the trouble between the parties became intensified, Mary and Charles ordered John to vacate Tract A. When he refused to do so, they barricaded the windows of the shack and posted a "no trespassing" sign upon the door. John ignored these gentle hints. Thereupon, on September 5, 1945, Mary, through her attorney, served him with written notice to vacate. Such notice produced no results, and Mary, on November 5, 1945, brought the forcible detainer action in the District Court for Multnomah County. John raised an issue of title, and the case was transferred to the circuit court. On November 26, 1945, John and Bernice commenced their suits against Mary and Charles to establish trusts.

No further consideration need be given to the forcible detainer case. It is conceded that final disposition thereof will depend upon the outcome of John's suit to establish a trust in relation to Tracts A and B.

The pleadings in the two suits embody the claims of the respective parties, as set forth above. After a hearing thereon, the trial court, without written opinion, made findings of fact and conclusions of law in favor of John and Bernice respectively, and, upon such findings and conclusions, entered appropriate decrees, and entered judgment against Mary in the forcible detainer case. From such decrees, Mary and Charles have appealed, and Mary has appealed from judgment against her in the forcible detainer case.

The overlapping of the testimony applicable to the two suits — which was, no doubt, unavoidable — has necessitated a painstaking segregation, out of more than 300 pages of testimony, of that applicable to each

suit. So segregated, and stated as briefly as is consistent with a proper comprehension of such portions as are relevant, the evidence is as follows:

As to John's case: He testified that he continued to live in the old shack for some time after Mary filed her amended complaint in the divorce suit. He ''was supposed'' to move; there was a court order requiring him to do so, and he said he would take Tract C and ''move over''. Mary agreed to that, and Mrs. Starr came to the shack and made the new contract, which was signed in the presence of Bernice, Mary, Mrs. Starr and himself. Tracts A and B were not mentioned. There was no agreement that Mary should take those over. His understanding was that he was buying Tract C, and that the original contract would remain unchanged in so far as Tracts A and B were concerned. He conceded that he made no payments under his new contract for Tract C. He paid Mary $25 a month, after taking over Tract C, with the understanding that such payments were to be applied on the original contract. She gave him receipts for some of the payments, although not for all. He did not observe that those receipts were made out for rent; he did not pay much attention to them, but thought in any event that he was paying rent until he got the place paid for. He had confidence in Mary and made the payments in reliance upon her good faith. His payments started in 1943 and continued until sometime in 1945, when Mary refused to accept any more money, giving no reason for such refusal. The payments were supposed to pay all bills and keep everything up to date. A reasonable rental for the shack would be about $7.50 a month. He used only the shack, not the whole tract. Before the amended complaint was filed in the divorce case, he had purchased some lumber, which he had

placed upon Tract A. At his hearing upon contempt charges, the judge gave him permission to move the lumber to Tract C. He served eleven days in jail on the contempt charges. Upon being released from jail, he commenced to build a three-room house on Tract C. At Mary's request, he went to her house and talked with her. She said: "You are living downtown and you are going back and forth in building. I can't do anything with the boy. You come back here and board, just the same as you are downtown." That was what was done. He paid $15 a week as board for himself and the boy. He conceded that Mary had worked hard and earned her own way for eighteen years. They both did. She worked all day.

Mary denied that Bernice was present at any time when Mary, John and Mrs. Starr were together. Regarding John's new contract on Tract C, she said: "Mrs. Starr handed him his and said, 'Mr. Helzer, this is yours.' And we each had our copy, and we looked at them and he said, 'That is perfectly fine,' and he liked it very much. He said he did not want anything to do with the rest except that one-half acre." When John first moved into his shack, he paid no rent, but afterwards he paid $25 a month, which included charges for water and light, for which he took monthly receipts. Notice to vacate was served upon him September 5, 1945. He was requested to vacate for the reason that he was troublesome, permitting strangers to use the property for vegetable gardening, and accusing Mary of taking his carpenter tools. She married Charles on April 5, 1945. John asked Mary if she wanted trailer people (on Tract A). She said she did, if it would help her with her payments. She collected the rent from three trailer tenants—$5 a month each. John would get drunk and keep coming to the house

and asking for his tools. After he refused to move on request, she and Charles nailed up the windows and put a "no trespassing" sign on the door. In September, 1945, she had the light cut off. In the same month, Bernice, for John, offered Mary his monthly payment, which was refused. In October, 1945, John wanted to pay his rent and wanted written receipts. She refused to accept the money, and told him that she wanted him to move. She completed her payments to Mrs. Starr during the spring and summer of 1945, but did not inform John thereof. She never made any false representations to John in regard to the property. He never made any claim respecting the property and always said he did not want it. She denied having asked John to return to the place after the divorce, and denied having had trouble with the boy. She denied that John ever paid $15 a week for board. She admitted having given him a receipt dated October 1, 1943, reading "Board paid in full", but said that that was for the support of their minor son.

Bernice testified that she was present when John's individual contract for Tract C was executed. She took no part in the conversation and was not in the room at all times, but was there when the contract was signed. There was only one contract signed.

Mrs. Starr testified that she was the former owner of the property involved and executed the original contract of sale. After a telephone conversation with Mary, she prepared new contracts, and, on February 1, 1942, at a meeting with Mary and John in their home, she took up the original contract and delivered a new contract to Mary as vendee of Tracts A and B, and a new contract to John as vendee of Tract C. These contracts were signed and delivered in John's presence. He wanted a contract for Tract C made out in his name.

In June, 1942, John's contract was cancelled, and a new contract covering Tract C was executed with Mary as vendee. John was present on that occasion. Mary made all the payments; John made none. Bernice was in the kitchen of the home when John's contract on Tract C was delivered, but took no part in the conversation. Mary's contract on Tract C was executed June 21, 1942, but was dated back to February 1st. Bernice never had anything to do with any of the transactions. After the property was divided between Mary and John, Mary paid her $15 a month for three months. In June, when she took Tract C over, she commenced making $25 payments and kept that up. John surrendered his contract to Mrs. Starr in June, 1942. He made no payments on Tract C, although requested several times to do so.

Mr. F. E. Wagoner, attorney for Mrs. Starr, testified that, on May 18 and June 8, 1942, at Mrs. Starr's request, he wrote John, asking him to place his contract on Tract C in good standing. On June 29, 1942, he notified John by letter that a new contract had been executed to Mary covering Tract C, and that she had assumed the obligation.

Charles Hughes, Mary's husband, testified that in October, 1945, John came to the house and wanted to pay rent, which Mary refused. John, on that occasion, was drunk and noisy.

As to Bernice's case: Bernice, aged thirty, daughter of John and Mary, testified that, with her mother, she moved into the new house on Tract C in the fall of 1942.

"Q. Now, what, if any, agreement was had on that between your mother and your father and yourself? A. She was complaining back and forth about him living in the new house and her and the kids

living in the old place and so finally he turned it over to her that way; and when he got the house done we moved over there and he started to live in the cabin. Q. Now just state, using the words that your mother used, as near as you can, just what did she say to your father? A. She said the kids and I would move in the new place and he live in the old place. * * * He was going to put up two rooms and she complained and he started in there to build and to turn it over; she would take that property and he would live in the cabin * * * and he had to do the labor and she and I would buy the material to put the place up. * * * Q. Now, Miss Helzer, what was said, if anything, as to who was to own that house after it was finished? A. Me and mother. Q. How were you to own it, on what shares? A. Well, me and her paid all the bills, half and half, fifty-fifty. Q. Was that the understanding you had with your mother and father? A. Yes. * * * Q. Did you and your mother pay for all of the material that went into that house, after your father made that agreement? A. Yes, sir. Q. And did you pay for one-half of it or not? A. Yes, I did. Q. And who did you give the money to? A. Mother. Q. And about how much did you pay altogether. * * * A. Eight hundred or nine hundred dollars.''

She kept no account of what she paid and took no receipts from her mother. She worked for various employers while the house was being built. She was employed at the Benson Hotel in 1941 and two months in 1942, earning $409.15. During the remainder of 1942, and in 1943 and part of 1944, she worked at Emanuel Hospital, earning $1515.84. During part of 1944 and until September, 1945, she was employed in a shipyard, earning approximately $2158. [Thus, her total earnings during the period in question was approximately $4083.] She did not become aware that Mary had

taken a deed to Tract C in her own name until just before she (Bernice) brought this suit. She took no receipts from Mary, because she trusted her. That was supposed to be their home and they were supposed to live right there together. They never had any trouble until Mr. Hughes came in; then "they" put her out every day and told her to go and live with her father. Her mother has been a hard working lady for a long time and always pretty kind to her. She (Bernice) paid board to her mother. Mary paid the bills for the building material, etc., "but she asked so much money and I paid one-half and she paid one-half", and they kept right on going. Bernice paid Mary for the building "every week when we got paid". She paid $300, "or something", in 1942, $700 "and something", in 1943. Mary asked $20 a week of her, besides board, while she was in the shipyard, or whatever she asked for she got. They paid all the bills up. She paid $20 a week from October 1, 1944, until September 30, 1945. All of that "was to go in the house". "Every week I got paid, we cleaned up the bills". She said that Charles made improper advances to her while she lived in the house on Tract C, which conduct upon his part caused her to leave home. [Charles made no denial of her testimony in this regard.]

John testified that he commenced putting up a three-room house, 24x24. While he was working, Mary and Bernice came over. He was living in town. Mary said to him: "You are using all the lumber and putting up a nice place and I am living in that old shack with the kids." They kept on bothering him, until finally he got tired of it and said: "I will tell you what I will do. You and the girl pick up where I leave off, and you pay all bills as they come in and finish it, furnish

everything, and I will do the work." Mary responded: "You can move over there and we will move out." Mary said that she and the daughter would pay the bills, and that they would have the house, and John was to go over in the shack, which he did. Mary and Bernice were to pay Mrs. Starr also, and take over the contract. John put the house up, roofed and shingled it, put on the siding, laid the floors, fixed the plumbing, painted the house, and did everything except plastering and installing windows and doors. He excavated for septic tanks and for a water connection with the main—over five hundred feet distant—and laid the water pipe.

Mary testified that she and Bernice moved into the new house shortly before Thanksgiving, 1943. She married Charles April 5, 1945. She denied ever having agreed that the house was to be hers and Bernice's, or ever having told Bernice so. She said that she has worked for some eighteen years steadily, and has made her own way. She paid the money for all three tracts. Bernice never paid her anything to be applied on material. Such payments as she made were supposed to be for board, and even those she did not make every month but only when and what she wanted to give. Bernice was never forced to pay board, and Mary never had any of Bernice's money in her custody or control. There was no agreement that John was to do any work on the new house. "He was asked at all times to keep his hands off that property, which he did not do. When I would go off the place, he would go over and work on it, but he was never asked to do any work." Mary paid for all the materials, for the reason that she didn't want John to have any part in the property. John went ahead and worked on the property "on his own concern". He did do some work,

but she paid him for it, not in cash, "but some of his rent was added to this as labor and he bought the truck back [a truck formerly owned by John and Mary] and he owed $300 for it and he owed me one-half for it and the other half was allowed on his labor." Neither Bernice nor John ever claimed an interest in any of the three tracts. John admitted all the time that he did not want anything to do with that place, ever since they bought it. "He did not want that rat hole; it was not good enough for him."

"Q. How much work did Mr. Helzer do on that house, * * *? A. That is quite hard to estimate. * * * Q. Did he do some work on the foundation? A. Yes. Q. And did he do some of the shingling? A. Yes; he put the foundation up himself, as far as the flat work, and from there on, I took over, as far as the level base. Q. You yourself did some of the construction work on the house? A. Yes, sir; I sure did a plenty of it. Q. What did you do? A. Commencing, we had the siding to do; he put on the shiplath on the siding, nailing the shingles on, and after we got to shingling, there were three boys on the roof, and Mr. Helzer and I would pass them the shingles, and it wasn't very long until the three boys at that time, well, from then on, we did the shingling, the three of us. We did it, and we had a man in; sometimes the boys playing around would come in and fuss around—there were too many of us to estimate or say how much he did. I was up on the roof everytime he was up. * * * He said: 'This is your house and you are going to do it.' That is the way it was, it was up to me. * * * Q. Mr. Helzer never did finish the plumbing? A. No; it isn't finished now. * * * The reason for that is just a habit of his, never to finish things; a habit of not finishing things."

The first time she learned that Bernice claimed an interest in Tract C was when this suit was commenced.

She did not know what the material for the house cost, but produced various material bills. She and John went together to pick up lumber and materials, as she had no driver's license. She detailed bills amounting to about $1500, but said that she had estimated roughly that she had paid $3400. She and John brought the siding and flooring home together, because they could not get it delivered. They did this on her days off or evenings. She did not want him to build the house. He put in the plumbing, but she did not want him to. She agreed that he might put in the septic tanks. He made the connection with the water main, but she told him: "You are doing this on your own accord." He started the house for himself, and went ahead and did a lot of building and a lot of work after she wanted him to cease. This he did for orneriness. Bernice paid $6 a week board for about six months, but when she went into the shipyards, she did not pay any board at all. After Mr. Hughes stepped in, Bernice paid altogether $54. Twice she paid $15, and twice $12, and that is all she paid in that whole year and a half. She may have paid something off and on when she was in the Emanuel Hospital, after that $6, but at no definite time and no definite amount. She paid no part of the materials in the building. She got friendly with her father only since Mr. Hughes came in. Mary and Bernice always got along all right until she got rough with Mr. Hughes, and sassy. John loaned Mary $100 to pay for the sink, but she repaid him, either in cash or a credit on the truck. In 1942 and to June 19, 1943, Mary received $2.66 a day, six days a week. Thereafter, she went in the shipyards and her net check was $34 plus, a week. She worked there until July 9, 1945.

■ A constructive trust is one implied by law, re-

gardless of the intention of the parties, for the purpose of working out justice between them.

"* * * A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee * * *.

"* * * A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief."

Cardozo, J., in *Beatty v. Guggenheim Exploration Co.,* 225 N. Y. 380, 386, 389, 122 N. E. 378.

■ Such a trust arises "where a person's money with his consent is used by another in purchasing property, but he does not consent that the title to the property shall be taken in the name of the other." Restatement, Trusts, vol. II, p. 1341. The same work (p. 1342) gives the following illustration:

"A pays money to B and directs B to purchase the land with the money and to take title in A's name, but B wrongfully takes the title in his own name."

This court has expressed itself in similar terms:

"It is elementary law that if A intrusts B with money for the purpose of buying real estate for the former and B takes the money and buys the property, taking title to himself without consent of A, B at once becomes a trustee *ex maleficio* for the benefit of A."

Burnett, C. J., in *Enes v. Pomeroy,* 104 Or. 169, 173, 206 P. 860.

See also *Tate v. Emery,* 139 Or. 214, 220, 9 P. (2d) 136.

■ Relief is granted in such cases upon the ground that "to deny it would permit the alleged trustee to un-

justly enrich himself through a breach of faith." *Kane v. Kane,* 134 Or. 79, 111, 291 P. 785. This case is not cited as a precedent, as the judges were equally divided in opinion. The quoted matter is from the opinion of Mr. Justice Rossman, in which Mr. Justice Rand and Mr. Justice Belt concurred. The principle, however, is laid down by the following authorities: Restatement, Restitution, section 160; Pomeroy's Equity Jurisprudence, 5 ed., section 1044; Scott on Trusts, section 462.2.

■ Secrecy and the violation of a duty imposed under a fiduciary or confidential relationship are the elements of a constructive trust *ex maleficio. Barger v. Barger,* 30 Or. 268, 274, 47 P. 702; *Chance v. Graham,* 76 Or. 199, 207, 148 P. 63; *Urquhart v. Belloni,* 57 Or. 314, 320, 111 P. 692; *Jenkins v. Jenkins,* 66 Or. 12, 19, 132 P. 542.

■ It is suggested, in this connection, that a fiduciary relationship existed between John and Mary even after their divorce. We think, however, that whatever fiduciary relationship may have existed based upon the marital status, the divorce ended it. *Shlensky v. Shlensky,* 369 Ill. 179, 187, 15 N. E. (2d) 694; *Farrell v. Farrell,* 243 Ala. 389, 392, 10 So. (2d) 153. That apart, however, and assuming the factual situation to have been as pleaded in John's complaint, Mary, as John's agent, owed him a duty in respect of the proper application of the moneys which he paid into her hands, and a fiduciary or confidential relationship resulted under which she would not be permitted to assume a position in which her interest conflicted with her duty. *Rowe v. Freeman,* 89 Or. 428, 436-7, 172 P. 508, 174 P. 727; *Burgdorfer v. Thielemann,* 153 Or. 354, 374, 55 P. (2d) 1122, 104 A. L. R. 1407; 23 Am. Jur., Fraud and Deceit, section 14. The same principle is applicable to Bernice's

case. An agent has the duty to act solely for the benefit of his principal in all matters connected with the agency, and this duty applies to gratuitous as well as to paid agents. Restatement, Agency, section 387 and Comment C.

██ The security of legal titles to real property is a matter of great public concern, and the courts will not impose either a resulting or a constructive trust upon such titles by parol unless the complainant sustains the burden of proof by strong, clear and convincing evidence. 3 Bogert, Trusts and Trustees, section 472, p. 15. While more than a preponderance of the evidence is not required in any civil case (section 2-1001, subd. 5, O. C. L. A.; *Metropolitan Cas. Ins. Co. v. Lasher,* 152 Or. 161, 164, 52 P. (2d) 1133), this court has emphasized that in this particular sort of case the proof, in order to preponderate, must be of an extraordinary persuasiveness. Some of the cases, with the court's comments upon the character of evidence required, follow: *Sisemore v. Pelton,* 17 Or. 546, 21 P. 667 (clear, certain, and convincing); *Snider v. Johnson,* 25 Or. 328, 35 P. 846 (full, clear, and convincing); *Barger v. Barger,* supra (strong, clear, convincing, and indubitable); *Oregon Lbr. Co. v. Jones,* 36 Or. 80, 58 P. 769 (clear, certain, and convincing); *Schwartz v. Gerhardt,* 44 Or. 425, 75 P. 698 (clear and convincing); *De Roboam v. Schmidtlin,* 50 Or. 388, 92 P. 1082 (clear and convincing); *Chance v. Graham,* supra (clear, explicit, and satisfactory); *Barnes v. Spencer,* 79 Or. 205, 153 P. 47 (clear, full, and convincing); *Coe v. Coe,* 75 Or. 145, 145 P. 674 (clear and definite); *Neppach v. Norval,* 116 Or. 593, 240 P. 883 (clear and unequivocal); *Smith v. Barnes,* 129 Or. 138, 276 P. 1086 (clear and highly cogent); *Am. Surety Co. of N. Y. v. Hattrem,* 138 Or. 358, 3 P. (2d) 1109, *Johnston v. McKean,* 177 Or. 556,

162 P. (2d) 820, and *Fox v. Maurer,* 178 Or. 64, 164 P. (2d) 417 (strong, clear, and convincing).

■ It does not appear that John made any claim to ownership in Tracts A and B until after he was sued in forcible detainer. For many of his $25 monthly payments to Mary he accepted receipts specifically worded as being for rent, and, while those were written upon ordinary printed rent receipt forms, nevertheless, on several of them, the word "rent" or the words "for rent" appear in Mary's handwriting. His testimony that the original contract covering Tracts A, B and C was not surrendered when the new contracts, to Mary for Tracts A and B, and to him for Tract C, were executed and delivered, is unconvincing, and is positively contradicted not only by Mary but also by the vendor, Mrs. Starr. No one claims or even suggests that Mrs. Starr was not a disinterested witness, or that she was a party to any fraud against John in the premises. Both he and Mary, of course, were interested witnesses, but John's testimony was not corroborated in any substantial particular. In our opinion, Mrs. Starr's testimony was fatal to John's contentions. *Martin v. Thomas,* 74 Or. 206, 144 P. 684.

■ Moreover, the procuring by John of a new contract of sale covering Tract C, the terms of which were inconsistent with and could not stand together with those of the original contract covering Tracts A, B and C, may in itself be regarded as a discharge or surrender of the original contract. *Spreckels v. Bender,* 30 Or. 577, 582-3, 48 P. 418; *Associated Oil Co. v. La Branch,* 139 Or. 410, 414, 10 P. (2d) 597.

■ It is contended that, under the statute of frauds (section 2-905, O. C. L. A.), an interest in real property, other than a lease for a term not exceeding one year,

may not be transferred except by a conveyance or other instrument in writing subscribed and executed with legal formality. It is settled, however, that a contract of the kind herein involved may be abandoned by parol. *Elliott v. Bozorth*, 52 Or. 391, 403, 97 P. 632. This is what was done in the present instance.

■ We are constrained to hold that, tested by the requirement of strong, clear, and convincing evidence applicable to such cases, John failed to establish, by a preponderance of the evidence, an equitable right to the creation of a constructive trust in his favor.

As to Bernice's case, it must be conceded that the evidence is more satisfactory. John's testimony to the effect that the very considerable amount of labor that he performed upon the new home on Tract C was done for the benefit of his former wife and his daughter appears to us to be reasonable. More especially is this true in view of the fact that the daughter, Bernice, is suffering under some sort of physical handicap. The nature of such handicap the evidence, unfortunately, does not disclose, but both court and counsel recognized it and referred to it in the course of the examination of Bernice as a witness. Mary and Bernice went into possession of the new house, and their relationship was cordial and harmonious until Mary's new husband came upon the scene. For that matter, notwithstanding the fact that Mary caused John to be brought before the court upon contempt charges during the course of the divorce proceedings and that, as a result, he was incarcerated in the county jail, their relationship thereafter was not inharmonious until Mary remarried. She even borrowed money of him!

Mary's testimony with regard to John's labor on the house is self-contradictory in important particulars.

She said that she forbade him to do any of the construction work, and that she herself assumed full responsibility therefor.  She was employed in the ship-yards during the day, while John worked on the "swing shift", and, when she returned home evenings, she found that, in her absence, he had been working on the house.  In another part of her testimony she contended strongly that she worked on the house along with him. She attributed his working on the house at all to "orneriness", but contradicted herself by testifying that she accompanied him to various places to secure the needed building material.  Bernice's testimony, on the other hand, is definite and positive in most particulars.  While she was unable to specify in detail the various sums which she contributed toward the cost of the property, she did testify most emphatically that her mother exhibited the bills to her weekly and that she always paid one-half thereof.  Mary herself appeared to be uncertain as to the amount which she expended for the property and improvements.  Her rough estimate of $3,400 is evidently pure guesswork.

It is argued that the evidence does not show clearly that the amount of Bernice's contribution towards the purchase and improvement of the property represented an aliquot part of the total expenditures for such purposes.  In *Barger v. Barger,* supra (30 Or. 268, 276, 47 P. 702) the so-called aliquot-part rule in such cases is discussed as follows:

"* * * The fund, or other form of property which it is sought to trace into a different form, does not lose its identity, while it may change in semblance, as, if a sum of money is expended for a parcel of land, or a band of cattle exchanged for stock in a bank, the property form is changed, but the identity of the original form is traceable and

distinguishable. The same may be true where several parties have contributed in aliquot parts, the relative proportion in the changed form of the property may be traced and distinguished. That which was the property of the cestui que trust in the first instance continues to be his property in equity throughout all of its metamorphoses, but when the identity is lost the trust escapes: See Perry v. McHenry, 13 Ill. 227, 228; Niver v. Crane, 98 N. Y. 47. It is, therefore, the entire ownership, speaking in an equitable sense, that must be established, and not some equitable lien upon the changed form of property; and, if established, the cestui que trust takes the property thus identified, not that his demand be satisfied out of it. Hence it is that payments made in common by the one asserting the claim and the alleged trustee, *unless made in aliquot parts;* or payments made out of commingled and indistinguishable trust funds, do not evidence a resulting or constructive trust, simply because the identical property is not traceable or recognizable in its changed conditions. It cannot be said that the cestui que trust is the equitable owner of the new form of property: Cutler v. Tuttle, 19 N. J. Eq. 561; Ferris v. Van Vechten, 73 N. Y. 120; and Browne on the Statute of Frauds, § 86.'' (Italics ours.)

In that case, a husband, without objection from his wife, used the latter's money jointly with his own in a series of business ventures, in which he purchased certain properties, the title to which he took in his own name. The funds of each had been so intermingled and confused that the wife's money could not be traced and distinguished as representing an aliquot or proportional part of the property purchased. It was apparent that she consented to her husband's taking title in his own name. Under the circumstances, it was held that the money furnished by the wife should

be regarded as a loan to the husband rather than the imposition of trust obligations upon him.

In *Holohan v. McCarthy,* 130 Or. 577, 281 P. 178, certain household furniture was purchased by a husband with intermingled funds of himself and his wife. It was held that the funds had been so intermingled that a court of equity should not attempt to "change the ownership."

In *American Surety Co. v. Hattrem,* supra (138 Or. 358, 3 P. (2d) 1109, 6 P. (2d) 1087) a wife had made certain advances to her husband, not in order that he might invest the moneys for her in real property, but for him to use as capital in his bond and security business. The amount advanced by the wife was indefinite and merely an estimate. It was held that, unless made in aliquot parts, where payments are made in common by one asserting a claim to an implied trust and the alleged trustee, or where payments are made out of funds commingled and indistinguishable, a resulting or a constructive trust may not be established.

So, in *Savage v. Savage,* 163 Or. 26, 94 P. (2d) 134, it was held that, in order to invoke the presumption of a trust upon evidence that a wife had paid a part of the purchase price of land conveyed to her husband, there must be evidence of some definite and specific property of the wife which the husband had acquired, and that evidence that the wife had paid "some" money toward the purchase price was too indefinite and vague to establish a trust in her favor.

The general rule is that no change effected by the trustee in the form of trust funds will prevent a court of equity from aiding the beneficial owner in reaching the trust property in its changed form, and in procuring a transfer thereof. 4 Pomeroy's Equity Ju-

risprudence, 5 ed., section 1058c. The courts are in substantial agreement that where one contributes an aliquot part of the whole purchase money, and it is agreed that he is to have an interest in the property proportionate to his contribution, a resulting trust will be raised in his favor. Scott on Trusts, vol. 3, section 454.

Bernice's evidence was sufficient, we think, if believed by the court, to establish that she had paid a definite aliquot part of the cost of the land and improvements—viz., one-half thereof. The lack of a definite recollection upon her part of the exact amount of the total sum paid should not have the effect of denying her any remedy. There is here no question of a complicated intermingling of funds, or of a variety of investments. But one piece of property was being acquired, and that not for a definite price but merely for payment of all costs of material going into the construction of the dwelling. Of these costs, Bernice and Mary each paid one-half. Even Mary does not know the total amount of the expenditures. Mary simply presented the bills, and Bernice immediately paid her one-half thereof. Thus, each contributed an aliquot part of the price, and each was entitled to a proportionate aliquot interest in the property. *Barger v. Barger,* supra.

The question resolves itself into one of the veracity of the witnesses. Both Bernice and her mother were interested witnesses, it is true, but Bernice was corroborated by her father in respect of the making of the agreement. As we have indicated, the mother's testimony was self-contradictory and unsatisfactory, while Bernice's was emphatic, clear and convincing.

The agreement under consideration here is of the sort of family agreements that are favorites of

the law. *Blacklaw v. Blacklaw,* 150 Or. 244, 250, 44 P. (2d) 728; *Koehler v. Koehler,* 75 Ind. App. 510, 121 N. E. 450. We quote from the opinion in the latter case:

"Under the circumstances it was competent for the parties to agree that each child should share equally in the benefits of the family enterprise, notwithstanding the inequality of their respective contributions. Likewise it was competent for the parties to fix by their mutual agreement the exact interest of the parents in the family undertaking, regardless of the amount contributed by the parents thereto. The consideration for that agreement does not rest wholly on a pecuniary basis. Blood relationship, family ties, love, and affection, and the welfare of the family group, are involved, and these constitute the highest consideration. Family agreements of this nature are favored by the law. Harvey v. Hand, 48 Ind. App. 392, 95 N. E. 1020. The proof of the agreement, and of all the other elements essential to support a resulting trust within clause 3 of section 8 of the statute, is conclusive, and the trial court did not err in holding that the respective interests of the parties in the real estate are fixed by the agreement."

The contributions in the instant case were made by a mother and daughter between whom very cordial and affectionate family relations existed. The daughter, moreover, as has been stated above, was under some measure of physical handicap, and it may be presumed that the mother was solicitous for her welfare. There is respectable authority to the effect that, where members of a family contribute to a common fund for the purchase of real property, title to which is taken in name of one of them (there being no evidence that a gift was intended), then, if they are unable to show how much each contributed, equity will presume that their beneficial interests in the property are equal.

3 Scott on Trusts, section 454.5, p. 2292, citing *Barrows v. Bohan,* 41 Conn. 278; *Edwards v. Edwards,* 39 Pa. 369; *Koehler v. Koehler,* supra. The following quotation from *Edwards v. Edwards,* supra, is peculiarly applicable to the facts in the case at bar:

> "*   *   * As the parties have had ample opportunity to state their accounts in such manner as would enable the judicial mind to proceed with some degree of satisfaction; and as both have refused to do so, we deem it fair and reasonable to treat the case as destitute of evidence of their respective advances, and then to apply the principle of Shoemaker v. Smith, 11 Hump. 81, before referred to, that, in the absence of evidence, the legal presumption is that their proportions were equal.   *   *   *"

The trial judge saw and heard the witnesses. His conclusions upon the question of their veracity are entitled to considerable weight. We feel that he decided the question correctly.

The decree in the case of John B. Helzer v. Mary B. Hughes et vir is reversed, with costs, and the cause will be dismissed. The judgment in the forcible detainer case (Mary B. Hughes v. John Helzer) is reversed, with costs, and with directions to the court below to enter judgment for plaintiff. The decree in the case of Bernice L. Helzer v. Mary B. Hughes et vir is affirmed, with costs.