Argued May 6, 1958, modified July 15, 1959, petition for
clarification denied October 14, 1959

STANTON *v.* WEBER ET AL

341 P. 2d 1078

*Irving Rand,* Portland, argued the cause for appellants. With him on the brief were George H. Brewster, attorney for appellant LaBertew, Redmond, and James F. Bodie, attorney for appellants Fray, Prineville.

*Robert H. Hollister,* Portland, argued the cause for respondent. On the brief were Hollister & Hollister, Portland.

Before PERRY*, Chief Justice, and ROSSMAN, LUSK, McALLISTER** and SLOAN, Justices.

---
\* Chief Justice when case argued.
\*\* Chief Justice when case decided.

McALLISTER, C. J.

This suit in equity was commenced by the plaintiff, Roy C. Stanton, to impress a trust in his favor upon certain lode mining claims, legal title to which was held by the defendant, Fred E. Weber. The intervenors, Albert E. Fray and Leland F. Fray, claim superior title through the alleged prior filing of certain placer mining claims on the same property. The defendant Mary LaBertew claims some interest in the property as an assignee of the Frays. From a decree in favor of plaintiff, the defendants and intervenors appeal.

The mining property involved in this case is situated in the Ochoco National Forest in Crook county between Prineville and Mitchell. At one time it was known as the Central Oregon Quicksilver mine. Prior to World War II one Ted Takahashi acquired the property and conducted extensive exploration and mining operations thereon. He established a mining camp with a large retort, bunk house, cook house and other buildings. He also constructed head works, sank shafts, dug tunnels and from these underground workings accumulated several large dumps of ore. When the war broke out, Takahashi was forced to cease operations and leave the property with the dumps of ore still unprocessed. The property stood as Takahashi left it until 1951.

In 1951 the plaintiff, Roy Stanton, acquired Takahashi's interest in the claims under an oral agreement amounting to a waiver of Takahashi's rights to the mining claims and a gift of the ore in the dumps. Takahashi later confirmed this transaction by giving Stanton a quitclaim deed to the mining claims.

Pursuant to his arrangement with Takahashi, plain-

tiff went upon the claims in April, 1952 and spent considerable time in prospecting and re-establishing the lines and corners of the claims as located by Takahashi. He also had the property surveyed by an experienced geologist and engineer named Westman. The survey indicated that the course of the vein or lode was different than as described in the claims filed by Takahashi and plaintiff decided to relocate the claims in conformity with the new survey. New location notices were not filed immediately but it appears that plaintiff and his employees were on the property completing the surveys and setting the corner and end posts prior to and at the time that the defendant Weber became interested in the mine.

In the middle of August, 1952 Westman told Weber about the property and introduced him to Stanton. After some negotiations Weber and Stanton entered into a written agreement dated August 28, 1952, under which Weber was given the right to process the ore in the dumps on the surface of the property. Under this agreement Weber was to pay all of the costs of processing the ore and the profits were to be divided 75 per cent to Stanton and 25 per cent to Weber. In executing the agreement, Weber recognized plaintiff's control of the mining claims and his right to dispose of the ore.

It is clearly established by the evidence that Weber insisted that the work of relocating the claims be completed before he started to perform his agreement to process the ore. At that time the survey had been completed and most of the claims had been posted but the discovery work had not been done. Stanton was unable to complete the discovery work immediately and to expedite the operation it was finally agreed that plaintiff would sign location notices in

blank, that these notices would be filled out by Weber from information furnished by Westman and filed by Weber in the mining records of Crook county. It was also agreed at that time that Weber would complete the discovery work and file affidavits stating that it had been completed within the 60 day period allowed by law which would expire in mid-October, 1952. Weber denies that he ever agreed to do the discovery work or file the affidavits but the existence of such a promise is clearly established by the evidence.

It is admitted by Weber that he filled out the location notices that had been signed by plaintiff using the descriptions furnished by Westman and that these notices were filed in the mining records of Crook county on September 2, 1952. It is further admitted that Weber did not file proof that the discovery work had been done and that because of his failure so to do, plaintiff's attempted relocation of the claims was ineffective.

In attempting to procure equipment and make arrangements to process the ore, Weber encountered considerable difficulty. He apparently became dissatisfied with his agreement and by a letter dated October 24, 1952, notified Stanton that he had discontinued operations on the property until a more satisfactory arrangement could be made.

Stanton, in turn, became dissatisfied with Weber's failure to process the ore and by letter dated December 16, 1952, attempted to cancel his written agreement with Weber dated August 28, 1952, covering the processing of the ore in the dumps. Weber countered by hiring one Frank Reid to go on the property and relocate the claims. Reid set new corner and center end posts as closely as possible to the posts which

had been set to mark Stanton's claims. Reid also sank new discovery shafts and Weber then filed new notices and relocated the claims. The Stanton claims which had been located as the Blue Ridge claims were relocated by Weber as the Winter Creek claims. The same legal descriptions were used in both instances.

When Stanton next visited the property in May, 1953, he learned for the first time that his mining claims had been jumped by Weber. In due course he filed this law suit to recover the property from Weber and for an accounting.

■ The evidence clearly establishes that in order to complete Stanton's relocation of these claims, Weber agreed that he would perform the discovery work on Stanton's behalf and file proof thereof. It is equally clear that Stanton relied on Weber's promise to perform the work on his behalf. It is not necessary to determine whether Weber's promise to do the discovery work was supported by any independent consideration. Consideration is not necessary to create an agency. The applicable rule is stated in the Restatement of Agency 2nd, § 16, as follows:

"The relation of principal and agent can be created although neither party receives consideration.

"Comment: a. Agency may result from a contract between the parties or it may result from a direction by a person to another to act on his account with or without a promise by the other so to act and with or without an understanding that the other is to receive compensation for his services if he does act."

In *Schafer v. Fraser et ux.*, 206 Or 446, 290 P2d 190, 294 P2d 609, this court adopted the doctrine of prom-

issory estoppel as stated in § 90 of the Restatement of Contracts, as follows:

> "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

■■ The principle of promissory estoppel is applicable to the law of agency. Section 378 of the Restatement of Agency 2nd is particularly pertinent in this case:

> "One who, by a gratutious promise or other conduct which he should realize will cause another reasonably to rely upon the performance of definite acts of service by him as the other's agent, causes the other to refrain from having such acts done by other available means is subject to a duty to use care to perform such service or, while other means are available, to give notice that he will not perform."

Under the foregoing rule, Weber could not relocate these claims in his own name until he had informed Stanton that the discovery work had not been done and had given Stanton an opportunity to perform the work himself.

■ Under the terms of his promise Weber was obligated to complete the discovery work and file proof thereof for Stanton. In performing his promise Weber was obligated to act with the same fidelity and loyalty as the law requires of any agent toward his principal.

The status of Weber as an agent operated to create a fiduciary relationship between Stanton and Weber, and Weber could not, in violation of his duty, relocate

the claims in his own name. This court so held in *Co-Operative Copper Co. v. Law,* 65 Or 250, 132 P 521, in which we quoted with approval 2 Lindley, Mines, § 407, as follows:

> "An agent, trustee, or other person holding confidential relations with the original locator, will not be permitted to relocate mining claims, and secure to themselves advantages flowing from a breach of trust obligations."

The following cases noted by Lindley as support for his statement of the rule are clearly applicable here: *Argentine Mining Co. v. Benedict,* 18 Utah 183, 55 P 559 and *O'Neill v. Otero,* 15 NM 707, 113 P 614.

In *Argentine Mining Co. v. Benedict,* supra, the supreme court of Utah stated:

> "* * * The attempt to so locate the claim was a violation of that duty and honesty which is due from every trusted agent to his employer or principal, and such conduct does not commend itself to a court of equity. This savors of a case where an agent or employe conceives a secret intention of taking possession of the property of his employer for his own benefit, and thus profit by his own failure to perform his duty to his principal. No such unlawful purpose can avail him in a court of justice."

In such circumstances the agent's actions on his own behalf will be held to inure to his principal's benefit and the court will impress a trust so that "what was done by the defendant in his effort to relocate the mines should be held to be done by him for the benefit of plaintiff * * *." *Co-Operative Copper Co. v. Law,* supra, at page 254. See *Hughes v. Helzer,* 182 Or 205, 185 P2d 537 and *Jones et al. v. Jackson et al.,* 195 Or 643, 246 P2d 546.

From Mechem on Agency § 1217, we quote the following:

"* * * an agent employed to do the annual assessment work on a mining claim, will not be permitted; after having lulled his principal into a sense of security, to defeat his interests by omitting to do the work and thereby causing his principal's claim to lapse, and relocating the mine in his own name and on his own account."

This is substantially the rule adopted in the Restatement of Agency 2nd § 403(d) which also approves the employment by the courts of the constructive trusts to remedy the inequities visited upon the principal by the agent's breach of duty. 2 Lindley, Mines, § 331, p 758; *Lockhart v. Leeds,* 195 US 427, 435, 25 S Ct 76, 49 L ed 263. See also *Stewart v. Douglass,* 148 Cal 511, 83 P 699 and *Cascaden v. O'Connor,* 257 F 930 (9 Cir).

Thus a gratutious agent who undertook to locate mining claims for another, and then in violation of his duty located the claims for himself, holds the claim for the benefit of his principal. *O'Neill v. Otero,* supra; *Neet v. Holmes,* 25 Cal2d 447, 154 P2d 854. See also *Evanoff v. Hall,* 310 Mich 487, 17 NW2d 724 (gratutious promise to buy land for another) and the Restatement of Restitution § 194(2).

Under the foregoing authorities it is clear that Weber, as a gratuitious agent for Stanton, was under a duty to act in accordance with his promise to complete the discovery work and file the affidavit of its completion in Stanton's name, and that his failure to do so and the subsequent location of the claims in Weber's own name was in violation of his duty to Stanton and that Weber, as a result, holds the claims for the benefit of Stanton.

■ We must next determine the priority between the placer claims located by the Frays and the lode claims located by Weber. The two placer claims covered 40 acres and were located in August, 1952. The same ground was covered by one or more of the lode claims filed by Weber in December, 1952 and January, 1953. The trial court held that the Fray placer claims were invalid for the reason that they were located over known lodes. We agree that the Frays located their placer claims over known lodes but this fact does not invalidate the placer claims. The applicable rule is stated by this court in *Oliver v. Burg,* 154 Or 1, 28, 58 P2d 245, as follows:

"* * * The fact that there may be a conflict between the ground covered by said quartz mining locations and the ground claimed by the plaintiff is of no importance since a perfected placer location does not confer the right to the possession of veins, or lodes, which may be found to exist within the placer limits at any time prior to filing an application for a placer patent, and such lodes may be appropriated by the placer claimant, *or by others,* provided the appropriation is effected by peaceable methods and in good faith: 2 Lindley on Mines, section 413. * * *" (Emphasis supplied)

Since the placer claims were located first, they are entitled to priority except as to the known vein or lode and 25 feet of the surface on each side thereof. As to the known vein or lode and 25 feet of surface on each side thereof, the lode locations are entitled to priority. See 30 USCA § 37, RS § 2333; *Mt. Rosa M., M. & L. Co. v. Palmer,* 26 Co. 56, 56 P 176 (1899); *Puett v. Harvey,* 51 Nev 40, 268 P2d 41 (1928); *Inyo Marble Co. v. Loundagin,* 120 CalApp 298, 7 P2d 1067 (1932); *Excelsior Iron Min. Co. v.*

*Justheim,* 122 Utah 573, 252 P2d 1084 (1953); and 2 Lindley, Mines § 415, p 979.

The decree of the trial court will be modified in accordance herewith. Neither party shall recover costs in this court.